# UNITED STATES DISTRICT COURT
for the
Eastern District of Wisconsin

| | |
|---|---|
| United States of America<br>v.<br>KIRK R.C. MICKELSON,<br>aka: "Kurt Cobain," "Captain Kirk," "Captain,"<br>BRIANA R. KETELSEN, aka: "Bri," and,<br>BRYAN F. EASON, aka: "Unc," "Uncle," "B"<br><br>*Defendant(s)* | )<br>)<br>)  Case No. 14-M-1205<br>)<br>)<br>)<br>) |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of __between October, 2011-April, 2014__ in the county of __Washington__ in the __Eastern__ District of __Wisconsin__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841, 846, 952 and 963 | Conspiracy to possess with intent to delver and delivery of methylone, a Schedule I controlled substance; importation of controlled substances; attempt and conspiracy |
| 18 U.S.C. §§ 924(c), 1112, 1956 and 1957 | Use of a firearm in furtherance of drug trafficking; tampering with witness/victim or informant; money laundering and engaging in monetary transactions in property derived from specified unlawful activity. |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Mark Gorenc, SA, Drug Enforcement Administration
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 5/6/14 @ 4:10 p.m.

_____
WILLIAM E. DUFFIN
*Judge's signature*

City and state: Milwaukee, Wisconsin

U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, Mark Gorenc, being duly sworn, do hereby depose and state:

1. I am a Special Agent with the Drug Enforcement Administration (DEA), assigned to the Milwaukee District Office. I have been employed by DEA since 1996 and have participated in numerous investigations involving drug violations during that time. Prior to being employed with DEA, I was employed as a Police Officer with the Franklin, WI Police Department for six months and as a Deputy Sheriff with the Milwaukee County Sheriff's Department for two years. I make this affidavit based upon personal knowledge derived from my participation in this investigation as well as information provided by other agents of DEA, Intelligence Analysts and Detectives, Investigators and Deputies of the Washington County Sheriff's Department (WCSD), the Maui Police Department (MPD), Homeland Security Investigations(HSI), the United States Postal Service (USPS)and the Beloit Police Department(BPD). Because this affidavit is being submitted for the limited purpose of securing a criminal complaint and arrest warrants, I have not included each and every fact known to me concerning this investigation.

2. As part of my duties as a DEA Special Agent, I investigate criminal violations relating to narcotics trafficking offenses, including criminal violations of the Federal Controlled Substance laws, including, but not limited to Title 18, United States Code, Sections 1956, and 1957, and Title 21, United States Code, Sections 841, 843, 846, 848, 952 and 963. I have been involved with various electronic surveillance methods, the debriefing of defendants, informants, and witnesses, as well as others who have knowledge of the distribution, transportation, storage and importation of controlled substances.

3. I have received training in the area of narcotics investigations, money laundering, financial investigations and various methods which drug dealers use in an effort to conceal and launder the proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of narcotics laws.

4. In 2012, the DEA and Washington County Sheriff's Department began an investigation into a poly-drug group. One of the main drugs the group trafficked in was 3, 4-Methylenedioxy-N-methycathinone Hydrochloride (Methylone). Methylone is also known by the street names "Molly" or "M-1," and is part of a family of synthetic, designer drugs commonly known as "bath salts." Methylone is a Schedule I controlled substance.

BACKGROUND

5. The Homeland Security Investigations (HSI) began to investigate individuals and organizations involved in the importation and distribution of Methylone from China and other countries into the United States starting in 2011.

1

6. As part of that investigation, Kirk R.C. MICKELSON (aka "Kurt Cobain," Captain Kirk," "Captain") was identified as the leader and a major importer and distributor of Methylone and other controlled substances in the Eastern and Western District of Wisconsin, Hawaii, Illinois, Minnesota, Pennsylvania, New Hampshire, Maryland and elsewhere.

7. The controlled substances were purchased from China by use of Western Union and other forms of payment. In order to avoid detection, MICKELSON used different individuals to purchase from the Chinese source of supply (SOS), had packages sent to different addresses and/or individuals throughout the United States, and created a network of co-conspirators to distribute and promote the use of Methylone and other controlled substances throughout the United States.

8. As part of the conspiracy, MICKELSON purchased firearms; body armor; gas masks and tear gas canisters so as to protect himself and members of the conspiracy and used threats, intimidation and violence to control members of the organization and to deter members from cooperating with law enforcement.

9. Briana R. KETELSEN (aka "Bri") resided with MICKELSON throughout most of the conspiracy and traveled with him throughout the United States. Briana KETELSEN sent money via western union for payment of methylone orders to China as well as for other controlled substances, received packages in her name, provided MICKELSON with other names and addresses to be used to send packages and store packages; transported methylone; identified distributors, and generally worked as his right hand person throughout the conspiracy.

10. Bryan F. EASON (aka "Unc", "Uncle", "B") was involved in the day-to-day distribution of methylone, sent money via western union for payment of methylone orders to China as well as for other controlled substances; received packages for the organization, provided MICKELSON with other names and addresses to be used to send packages and store packages; transported methylone; identified distributors; and generally worked as his right-hand person in Illinois and Wisconsin and oversaw the methylone distribution of the conspiracy when MICKELSON and KETELSEN were residing in Hawaii. EASON was also an enforcer for the organization and possessed numerous firearms and used threats, intimidation and violence to control members of the organization and to deter members from cooperating with law enforcement.

11. On June 28, 2012, HSI intercepted a parcel destined from China to Kahului Maui, HI. HSI opened the parcel which revealed approximately 1,771 grams of methylone. The parcel was sent from Jack Doe 1 in China to the recipient, Briana KETELSEN at 400-A Molokai Hema Street in Kahului, HI. Jack Doe 1 has been identified as the China source of supply for Methylone ("the China SOS for Methylone" herein).

2

12. Maui Police Department (MPD) began to conduct an investigation and on July 6, 2012, MPD, HSI and United States Postal Service (USPS) conducted a controlled delivery of methylone to the residence which they determined was the residence of Kirk MICKELSON and Briana KETELSON.

13. The methylone parcel was accepted by Kirk MICKELSON and a state search warrant was executed at the residence. Present in the residence was Kirk MICKELSON and Briana KETELSEN. A search of the residence lead to the seizure of approximately 44.67 grams of a controlled substance, hundreds of packets of what appeared to be a form of synthetic marijuana, a Tech 9 (9mm) handgun, a .44 caliber Wesson handgun, a .45 caliber HI-Point handgun, a high capacity handgun magazine, over 100 rounds of ammunition, 2 ballistic vests, 4 gas masks and 5 canisters of tear gas.

14. Briana KETELSEN was advised of her rights and admitted knowing that the parcel delivered that day contained methylone and that MICKELSON ordered it from the internet. KETELSEN stated that her name was on the parcel because MICKELSON's name could be "flagged." KETELSEN stated that they had previously ordered methylone several times and that they had ordered methylone twice since they had arrived in Maui. KETELSEN stated that after MICKELSON ordered the methylone, the methylone was packaged and shipped to Wisconsin for distribution. KETELSON also stated that the firearms belonged to MICKELSON. MICKELSON would ship the guns to and from Wisconsin so that they would always have the guns for protection for their methylone business.

15. MICKELSON was also advised of his rights and, although he denied knowledge that the parcel contained methylone, MICKELSON stated that the ballistic vests, gas masks and riot control gas were purchased for his uncle in Wisconsin.

16. A review of Western Union records obtained as part of this investigation for the time period between October, 2011 and January, 2013 revealed that over $50,000 was sent from Wisconsin to the China SOS for Methylone in 34 transactions including payments by MICKELSON, KETELSEN and EASON. On each payment, the China SOS was listed as the payee in China for all of the funds.[1]

17. A review of Wisconsin emails obtained as part of this investigation to the China SOS for Methylone revealed that the China SOS for Methylone received numerous emails for drug orders which matched the Western Union records linked to this conspiracy as described above. In fact, some of the emails specifically refer to the

---

[1] During a search warrant conducted by the Rock County Sheriff's Department in January 2013 of a residence used by MICKELSON and KETELSEN a Western Union receipt was found for $1,800 and the payee was the China SOS for Methylone. (see paragraphs 22-23 for additional information regarding this search warrant)

3

delivery of kilogram quantities of Methylone being sent to MICKELSON's address in Hawaii. In addition, other emails clearly were sent to the China SOS for Methylone that MICKELSON was arrested in Hawaii after the delivery of a package. The emails also revealed that those involved in this conspiracy were ordering numerous kilogram quantities of methylone as well as other synthetic drugs.

WASHINGTON COUNTY

18. In September 2012, a confidential informant (CI) made recorded telephone calls with John Doe 1 regarding the purchase of ½ kilogram of methylone. On September 26, 2012, the CI met with John Doe 1 and Jane Doe 1. John Doe 1 and Jane Doe 1 were arrested and taken into custody after delivering methylone to the CI.

19. John Doe 1 and Jane Doe 1 were both advised of their constitutional rights. Both voluntarily consented to be interviewed and gave statements against their penal interest. As part of his statement, John Doe 1 gave consented to the search of his storage unit in Dodge County and told law enforcement that he had additional ounces of methylone hidden in the storage unit. Pursuant to the consent search, an additional amount of methylone was seized. The seized methylone from the CI purchase and storage unit was sent to the North Central Laboratory for analysis and tested positive for 3, 4-Methylenedioxy-N-methylcathinone Hydrochloride (Methylone).

20. John Doe 1 stated that "B" was his source of supply (whom he later identified as Bryan EASON). John Doe 1 stated that he received methylone from Bryan EASON on consignment every few months and that he was in debt to Bryan EASON for $2,000 because of the methylone transaction leading to John Doe 1's arrest. John Doe 1 admitted that he had been receiving methylone on consignment from Bryan EASON for the last 9 - 12 months. John Doe 1 estimated that he purchased methylone from Bryan EASON 10 to 15 times. During the methylone transactions, John Doe 1 would travel from Washington County, WI and meet with Bryan EASON in random places such as Madison, Milwaukee, Beloit and Mukwonago. Bryan EASON was described by John Doe 1 as Kirk MICKELSON's top runner. John Doe 1 stated that his last methylone transaction with Bryan EASON was for 1/4 kilogram of Methylone.

21. On November 1, 2012, law enforcement conducted a proffer interview of John Doe 1. John Doe 1 provided additional information regarding Kirk MICKELSON whom he stated he met in 2010/2011. After a short time, MICKELSON began distributing methylone to John Doe 1. John Doe 1 continued to increase the quantities of methylone from grams to ounces to 1/2 kilogram purchases. John Doe 1 began purchasing 1/2 kilogram quantities of methylone in the spring of 2011. MICKELSON was residing in Beloit, WI at that time and John Doe 1 would travel to Beloit from Washington County to make many of these transactions.

22. After dealing with MICKELSON for a while, MICKELSON told John Doe 1 that he (MICKELSON) wanted to move to Hawaii with his girlfriend. In the spring 2012, MICKELSON introduced John Doe 1 to EASON. A 1/2 kilogram methylone transaction was set up between MICKELSON and John Doe 1. According to John Doe 1, EASON ended up meeting with John Doe 1 instead of MICKELSON and EASON gave John Doe 1 a backpack containing the 1/2 kilogram of methylone on consignment. All the methylone transactions with EASON occurred in Beloit, WI or at some half-way point between EASON's residence and John Doe 1's residence in Washington County. EASON told John Doe 1 during one of the methylone transactions that John Doe 1 would be dead if John Doe 1 ever turned EASON into the police.

23. On January 11, 2013, the Beloit Police Department (BPD) was contacted by HSI and informed that the Department of Homeland Security Customs and Border Protection (CBP) in Chicago intercepted a parcel addressed to MICKELSON at 1119 ½ Ninth Street in Beloit, WI. The parcel was shipped via TNT Express from an address in China.

24. The parcel was taken by the BPD so they could attempt a controlled delivery. On January 15, 2013, a BPD detective (working in an undercover capacity as a UPS employee) delivered the parcel to the Beloit address. KETELSEN answered the door and accepted the package from the detective. A short time later, the BPD executed a state search warrant at the residence. MICKELSON and KETELSEN were in the residence at the time of the search warrant. The search resulted in the seizure of the parcel, a .45 caliber handgun, approximately 70 rounds of ammunition, and several thousand dollars in US currency, and gun parts for an AR 15 rifle, a ballistic vest cover, with handcuffs, a large knife, 2 gas masks, a camera security system, and other items. MICKELSON and KETELSEN were both arrested on state charges and eventually released.

25. In 2013 Jane Doe 1 provided a proffer statement advised that while she dated John Doe 1, he began asking her to drive (John Doe 1's vehicle) to methylone transactions from Washington County.

26. According to Jane Doe 1, approximately 4 days after their (Jane Doe 1 and John Doe 1's) initial arrest in 2012, John Doe 1 asked Jane Doe 1 to drive him to Beloit from Washington County to meet with EASON. Jane Doe 1 agreed and drove John Doe 1 to Beloit. Jane Doe 1 dropped John Doe 1 off at EASON's residence, parked up the street and waited in the car. Approximately 20 minutes later, an unknown white male approached the vehicle and made contact with Jane Doe 1. The white male told Jane Doe 1 to come into the residence and she said no; however, the white male demanded Jane Doe 1 follow him and she became afraid for her safety and believed that something bad would happen if she did not comply so she exited the car and walked to the residence. Jane Doe 1 believed the male had a gun as he walked behind her as she walked to the residence. Jane Doe 1 recognized the house as one she had been at before

5

with John Doe 1. Once she entered the house she saw EASON, John Doe 1, and an estimated 2 additional unknown males in the dining room.

27. EASON then brandished a black colored handgun, pointed it at Jane Doe 1 and demanded she take off her shirt to prove that she was not wearing a "wire" or that she was not being followed. After taking off her shirt, EASON also made her lift up her bra, exposing herself. Jane Doe 1 stated that she was terrified for her own safety and felt as if she was in shock. She began crying and EASON explained that he had to make sure that they weren't working with the police.

28. Jane Doe 1 stated that the other males just sat around watching EASON and that she was crying. She observed EASON and John Doe 1 talking and saw EASON loan John Doe 1 money (approximately $800) for an attorney to represent him regarding John Doe 1's arrest. Jane Doe 1 also overheard John Doe 1 speak about paying EASON off the debt for the methylone and the attorney. Jane Doe 1 stated that John Doe 1 was still in debt to EASON for the methylone seized by the police and for EASON paying for his defense attorney and that, to pay off the debt, John Doe 1 and EASON worked out a methylone deal where John Doe 1 would send a co-conspirator to meet with one of EASON's runners to continue the methylone transactions.

29. John Doe 1 stated that EASON was MICKELSON's "muscle". EASON was also a gun enthusiast and went to gun shows. John Doe 1 stated that EASON had numerous firearms including several handguns and an AK-47 assault rifle. John Doe 1 stated that he spoke to MICKELSON and that MICKELSON said that he was moving to Hawaii and John Doe 1 should conduct his methylone transactions with EASON. Later, MICKELSON and his girlfriend moved to Hawaii. MICKELSON resided in Hawaii for approximately 4 to 6 months. After MICKELSON moved to Hawaii, he returned to Wisconsin twice (vacation). The packages were sent to EASON by MICKELSON and further distributed to John Doe 1. As MICKELSON was in Hawaii, John Doe 1 stated that he purchased methylone from EASON and that he purchased a total of 2 to 4 kilograms of methylone from EASON from the beginning of 2012 until September 2012.

30. In early 2014 law enforcement conducted a custodial interview of Briana R. KETELSEN, aka "Bree". After being advised of her constitutional rights, KETELSEN stated that after MICKELSON was off probation "bracelet" (September 28, 2011), they (MICKELSON and KETELSEN) began taking methylone together. KETELSEN stated that methylone is the same drug that she and MICKELSON were caught with and arrested for in Hawaii in July 2012. KETELSEN stated that she and Mickelson purchased a kilogram a month for the entire year of 2012. At times when the demand was high, they purchased 1 kilogram of methylone on a weekly basis. MICKELSON paid $3 to $4 per gram of methylone and would distribute it for $100 per gram. MICKELSON would send $3,000 to $4,000 and receive 1 to 2 kilograms of methylone. KETELSEN stated that the methylone (and other controlled substances) they obtained from China came from the individual she identified as the China SOS for Methylone.

According to KETELSEN, MICKELSON always placed the internet orders from Jack Doe 1 for the methylone. KETELSEN stated that they would send the money as payment for the drugs via Western Union and the China SOS for Methylone would be the listed as the payee. MICKELSON utilized several different email addresses including several secure addresses designed to hide/keep anonymity. KETELSEN identified Bryan EASON aka "Unc", as well as others as co-conspirators whom she and MICKELSON used to send Western Union money to the China SOS for Methylone, to receive packages of Methylone and or to distribute Methylone.

31. KETELSEN considered EASON to be MICKELSON's methylone partner/right hand man/second in charge. In 2012 when KETELSEN and MICKELSON moved to Hawaii for several months, they continued to order methylone from the Chinese SOS for Methylone. Upon receiving the methylone in Hawaii, MICKELSON would send the methylone package to EASON. EASON would then distribute the methylone to John Doe 1 and others. After MICKELSON and KETELSEN returned to Wisconsin from Hawaii; they distributed methylone to John Doe 1 until his arrest in 2012.

32. KETELSEN stated that she and MICKELSON utilized firearms as security to protect themselves and their drugs. KETELSEN stated that EASON also had several firearms. KETELSEN stated that MICKELSON did not have a legitimate job therefore a large part of the cash he had resulted from drug proceeds and other illegal activities. KETELSEN gave several examples of MICKELSON's drug proceeds spending; for example, according to KETELSEN, MICKELSON paid $6,000 cash for the Chrysler 300 vehicle that he purchased, MICKELSON paid $6,000 cash for KETELSEN's engagement ring and MICKELSON paid $1,000 cash for KETELSEN's diamond earrings. KETELSEN stated that EASON drives/owns a GMC Denali, and a maroon colored Pontiac G6 (registered in KETELSEN's name). KETELSEN advised they registered the G6 in her name because she was the only one that had a valid Driver's license. According to KETELSEN, EASON purchased the vehicles with drug proceeds. KETELSEN also stated that MICKELSON and KETELSEN would originally send the money via Western Union to Jack Doe 1 in China. After a while, MICKELSON and KETELSEN's names were flagged. MICKELSON then had others send the money to Jack Doe 1 and MICKELSON would instruct the person how to send the money via Western Union to China. MICKELSON would show the person how to fill out the Western Union form to send the money. MICKELSON told the person to make the false claim that the money was for clothing or beads. MICKELSON would pay the person money for making the Western Union payment to the Chinese SOS. KETELSEN stated that MICKELSON and other co-conspirators would use addresses in New Hampshire, Illinois and elsewhere to send the methylone package for the organization.

7